# United States Court of Appeals
## For the First Circuit

Nos. 24-1007
     24-1045

ARELY NICOLLE MONCADA ALANIZ,

Appellee/Cross-Appellant,

v.

BAY PROMO, LLC,

Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

George W. Thomas, with whom Robert L. Sirianni Jr. was on
brief, for appellant/cross-appellee.

Charles G. Devine, Jr. for appellee/cross-appellant.

July 2, 2025

**THOMPSON, Circuit Judge.**  In March 2020, the COVID-19 pandemic brought about a global health crisis which led to a rapid spike in demand for products not then in the collective consciousness of the world -- personal protective equipment ("PPE").  Across the world community, people needed PPE such as surgical masks, K-95 masks, and surgical coats, and it was needed in a hurry.  Amid this frenzied and unpredictable business landscape, Appellant and Cross-Appellee Bay Promo, LLC -- a miscellaneous merchandise supplier -- moved quickly to meet this urgent demand by supplying government entities and private corporations with PPE, and, in the finest capitalistic tradition, it looked to make a profit while doing so.  Appellee and Cross-Appellant Arely Nicolle Moncada Alaniz ("Moncada"), an "I-know-a-guy" kind of person, was brought in to participate in this entrepreneurial enterprise.

Lucrative contracts and agreements with suppliers and buyers got negotiated and effectuated, but whose efforts sealed those deals is the dispute which brought today's litigants to our doorsteps.  Following a cumbrous two-day bench trial in the Massachusetts Federal District Court, both parties gripe about the results below.  Bay Promo seeks a reversal of the court's breach of contract holding which found Moncada entitled to a commission payment on one lucrative PPE order.  Although Moncada thinks the district court got that piece just right, she's quite disgruntled

with the court's determination that she was not entitled to a commission payment on nine other orders she worked on. After untangling this web of claims, we find each party's protestations without merit.

## I. BACKGROUND

Our appellate work begins with a description of the pertinent facts that form the basis of this dispute. Arriving here from a bench trial, "we recount the relevant facts as found by the district court, consistent with record support." Reyes v. Garland, 26 F.4th 516, 518 (1st Cir. 2022) (quoting González-Rucci v. INS, 539 F.3d 66, 67 (1st Cir. 2008)); see also BioPoint, Inc. v. Dickhaut, 110 F.4th 337, 341 (1st Cir. 2024).

Bay Promo is a Florida limited liability company with its principal place of business in Tampa, Florida. Its two principals, Thisal Jayasuriya and Humberto Arguello, Jr., will be main characters in this story. Arguello's mother, Margina Arguello ("Margina"),[1] functioning as Bay Promo's general manager and sales manager, plays a role in this tale too. In order to set the stage for our analysis, it will be helpful to the gentle reader if we familiarize ourselves with a few agreements that materialized over a short period of time in the spring of 2020 and which underlie today's dispute. Once we understand these deals, we must also

---

[1] We refer to Ms. Arguello by her first name in order to keep the parties straight. In doing so, we mean no disrespect to her.

look at the conversations taking place between Moncada and Bay Promo along the way because, as we will explain, alleged promises of commission payments lie at the heart of the parties' contestations.

## A. Moncada's Commission Agreement

We'll start with the first formal tie between the parties. On March 23, 2020, Arguello brought Moncada, a resident of Massachusetts, into the Bay Promo fold to work as a "sales distribut[ion] officer." At the time, Moncada was enrolled as an undergraduate student at Emerson College and knew Arguello through a family connection back in Nicaragua.

The terms of Moncada's employment and the commission that all agreed she would earn on a pending order were memorialized in a thirty-day written Commission Agreement that went into effect on March 21, 2020.[2] Pursuant to that detailed agreement, Moncada's role with Bay Promo would include performing "duties as are customarily performed by an employee in a similar position," and "other and unrelated services and duties as may be assigned to [her] from time to time." However, of import here, Moncada's employment terms did not empower her to "enter into any contracts

---

[2] The astute reader may notice the Commission Agreement went into effect two days before Moncada's start with Bay Promo. As discussed below, the earlier date marked the beginning of what would become known as the New York Order organized by Moncada which was intentionally covered by the Commission Agreement.

- 4 -

or commitments for or on behalf of [Bay Promo] without first obtaining the express written consent of [Bay Promo]."

Along with outlining Moncada's day to day duties, this Commission Agreement included a promise from Bay Promo to pay Moncada a commission "based on 6% of gross sales of [$]3,640,000.00 USD . . . at the conclusion of each project."  Notwithstanding this 'each project' language, the parties acknowledge that the Agreement does not define the term, but they do agree that "project" in this initial agreement related solely to the purchase of protective masks by Denim & More, PC (a company the reader will become familiar with shortly) from Bay Promo for sale to New York City.  For any subsequent projects, the Agreement stated that the "commission rate will be determined by Humberto Arguello CEO [on a] project by project basis."

During her time with Bay Promo (which lasted about three weeks before the relationship soured), Moncada's job entailed, amongst other things, receiving purchase orders from clients and forwarding those orders to Arguello or Margina.  But at no point was she ever delegated the task of pricing sales items or drafting purchase orders or invoices (Arguello or Margina handled that).  As happened, Moncada was never formally terminated by Bay Promo, but her employment demise became quite clear once she lost access to her work "portal" in mid-April, and then her Bay Promo email a few days later.

Having laid out the basics of Moncada's employment arrangement with Bay Promo, we'll turn now to the various PPE orders in controversy that were placed with Bay Promo during Moncada's limited term. For each order placed by a couple of companies, specifically, Denim & More, PC and Cravens Group LLC (more to come in a moment on these pivotal players), Moncada feels that she is entitled to a 6% commission because she considers herself to be -- as they say in the common parlance of business -- the rainmaker who caused the introduction of these companies to Bay Promo in the first place.

### B. The New York Order

So, enter stage right, Lee Parrish, co-founder (with his son) of Denim & More, PC, a company that sold t-shirts and denim products. Shortly after its formation, which by serendipity occurred just before the start of the pandemic, and before Denim & More ever made a sale, a friend of New York Senator Chuck Schumer contacted Parrish inquiring whether his company could supply protective face masks to New York City. In response Parrish turned to his former associate, James Scott Vaughn, who referred Parrish to Moncada. Vaughn had recently worked with Moncada's father and knew of Moncada's access to Bay Promo.

After a round of brief Parrish/Moncada introductions via email on March 21, 2020, Parrish sent a purchase order to Moncada for PPE which she forwarded to Bay Promo. That purchase order

would later become known as the New York Order. Because the specifics of that order are relevant to our later analysis of Moncada's breach of contract claim, we'll provide you with some details of the negotiations and Moncada's role in the process. In placing the order, Parrish (acting as the middleman for New York City) requested "500,000 units per week of the KN95 and surgical masks [at a] $1.40 and [$0].34 price commitment." The purchase order further stipulated that Bay Promo would deliver batches of 500,000 U.S. Food and Drug Administration ("FDA") approved KN95 masks and 500,000 FDA-approved surgical masks to New York on April 1, April 8, April 15, and April 22, 2020. The total price for this purchase order was $3.48 million.

A critical part of the New York Order (at least from New York's perspective) was that the masks be produced in factories with FDA certification. Accordingly, during final negotiations, Parrish asked Moncada to forward to him FDA certifications for any mask manufacturing suppliers Bay Promo would use to satisfy the order. That same day, Moncada sent Parrish FDA certifications for five different Chinese factories.[3] After that, Parrish added

---

[3] Those manufacturers were: (1) Shanghai Dasheng Health Products Manufacture Co., Ltd.; (2) Xiantao Sanda Industrial Co., Ltd.; (3) San Huei United Company Ltd.; (4) Hangzhou Clongene Biotech Co., Ltd.; and (5) Xianoheng Zooboo Sports Goods Co., Ltd. Arguello later in a letter assured Parrish the New York Order would be manufactured by (2) Xiantao Sanda Industrial Co.

another demand to the order -- the requirement that Bay Promo would "be responsible for the delivery on time with payment."

On March 22, 2020, Moncada emailed Parrish a contract and revised purchase order on behalf of Bay Promo consistent with what had been negotiated up to that point. It obligated Denim & More to pay half of the invoice before production started and the remaining half "before delivery." However, prior to the parties signing the documents, the price per mask increased by 4 cents, bringing the total purchase order to $3.64 million. With the price adjusted, Moncada sent Parrish updated paperwork which Parrish signed the same day. On behalf of Denim & More, Parrish then wired half of the total invoice to Bay Promo on March 24, 2020.

The first specified delivery date, April 1, 2020, came quickly (perhaps a little too quickly) and Bay Promo failed to timely deliver the initial installment of the New York Order. When the first installment of masks finally did make it to the city several weeks late, New York City rejected them because they had come from a factory for which Bay Promo had not provided FDA certifications. Left without the masks it was promised, New York City refused to pay Denim & More the outstanding balance of its order. Denim & More in turn refused to make any further payments to Bay Promo and sued for a refund of its initial 50% deposit. Needless to say, Bay Promo refused to pay Moncada her full commission on the order.

For purposes of this appeal, and Moncada's role in the New York Order, this is all the reader needs to know at this juncture.

### C. The Contour Order

So back to the country needing product during the pandemic. On March 23, 2020, Parrish forwarded an email to Moncada and Arguello from a potential buyer of PPE in Kansas City. Throughout the process, the buyer -- a company called Contour -- engaged directly with Parrish in negotiating sales terms, who in turn worked with Bay Promo. Following up on Contour's interest, Arguello sent Parrish an email with a draft invoice for KN95 and surgical masks. Arguello included Moncada on this email to Parrish and referred to her as the "account rep." In response, Parrish told Arguello and Moncada he needed to modify the quantity of the order, and Arguello sent over an appropriately modified invoice. Moncada was not copied on this subsequent email and revision.

Three days later, Parrish's assistant sent Moncada and Arguello a second purchase order from Contour. Moncada looped in sales manager, general manager, and mother Margina, who updated Contour's existing order and sent a new invoice to Parrish for $503,960, listing Moncada and Arguello as the salespeople to the

transaction.[4]  Parrish (still playing the role of middleman) signed the new invoice on March 27, 2020 and paid Bay Promo on May 6, 2020 for what the parties refer to as the Contour Order.

### D. The Cravens Orders

While the ink was still wet on previous orders, Parrish recommended Bay Promo to Jeff Cravens, the owner of an apparel company called Cravens Group LLC.  The record does not tell us much about Cravens or his company; however, we do know he had a prior business relationship with Parrish.  Cravens acted in a middleman capacity similar to Parrish's role as far as sourcing various products that his customers needed.

After Parrish made the introduction, Cravens placed several PPE orders with Bay Promo seemingly at the request of companies such as Wells Fargo, Delta Airlines, Marriot, and more.  Cravens submitted his first order to Bay Promo on March 26, 2020 through Parrish.  For her part, Moncada forwarded an invoice to Parrish for the first Cravens Order on March 28, 2020.[5]  After that, the record shows that Cravens placed seven additional orders

---

[4] The record lacks any explanation as to why Margina listed Moncada as a salesperson (besides the Commission Agreement's reference to Moncada's title as a "sales distributor officer"); however, the designation here did not influence the district court's analysis or shape either parties' claims on appeal.

[5] The record is unclear whether Margina Arguello or Humberto Arguello prepared the invoice for the first Cravens Order; however, Moncada makes no claim that it was she who performed this task.

with Bay Promo via Parrish, none of which involved any further communication or dealings with Moncada.

### E. Moncada's Commission Payments

That factual history we just enumerated covers the orders for PPE that Bay Promo received during Moncada's short stint. Although all of the sales transactions (except for the initial New York Order) fell beyond the scope of Moncada's written Commission Agreement, Moncada believed she was responsible for all this new Bay Promo business due to her personal contacts, and when the orders started pouring in, she began to put pressure on Bay Promo about giving her a fair cut of the commission action. We briefly revisit each order to explain how she attempted to formulate new commission agreements with Bay Promo.

Starting with the Contour order, on March 24, 2020, Moncada spoke to Arguello about receiving a commission for the order and was told to take it up with Jayasuriya, Bay Promo's second principal and chief financial officer. Moncada followed up in an email to Arguello and told him that she planned to instruct Jayasuriya to draft a second commission agreement for the Contour Order which would grant Moncada a 6% commission of the total price of the order.[6] Arguello did not respond to Moncada's message, but

---

[6] We note here that this communication, and several others admitted as exhibits at trial, are written in Spanish without certified translations. At trial, the district court informed the parties "an Appeals Court . . . won't accept an untranslated

- 11 -

Moncada pursued her commission efforts by sending a WhatsApp text to Jayasuriya requesting a second commission agreement, one nearly identical to her first contract. Jayasuriya never responded. In the end, Moncada did not get a new written commission agreement or receive payment for the Contour Order.

Moving on to the Cravens transactions, in early April shortly after Cravens began placing orders with Bay Promo, Moncada proposed to Arguello that she could generate a commission for herself on future Cravens orders by marking up the cost per item by 6%. On April 3, 2020, Moncada tried to get Arguello to go along with this proposal and lobbied for a markup in an order from Cravens in connection with a Delta Airlines ("Delta Order") purchase. Seemingly in consideration of Moncada's request, the two discussed over text messaging whether to quote the items in the Delta Order at $1.50 or $1.59 each. Eventually, Arguello explained to Moncada that $1.50 was appropriate because the buyer was going to absorb the shipping costs. In response, Moncada texted back, "from the $1.50 the 6% is included. I will do it right now." Arguello responded, "Yes. Send them the quote." And Moncada did.

_____

document." This is correct, and this court "will not receive documents . . . not in the English language unless translations are furnished." 1st Cir. R. 30.0(e). Without any translations having been furnished, we rely on the district court's findings related to any Spanish documents as they were interpreted and used at trial.

- 12 -

Still unsatisfied and in search of new commission agreements, Moncada next turned to Margina and requested that an incoming Cravens Order -- later placed on April 14, 2020 -- contain marked up prices to reflect her 6% commission. Margina told Moncada the price would stay at $1.50 per item while Moncada repeatedly insisted the price should be $1.60. Eventually, Margina instructed Moncada to take it up with her son Arguello. A few days later, Margina sent a message to Moncada telling her the price per item would be increased to $1.56, to which Moncada responded, "I told [Arguello] that I will receive 6%."

At trial Moncada presented evidence and testified to other communications with Arguello regarding her plan to mark up prices to cover her commission, but the district court found Moncada's testimony on that front not credible.

Mid-April 2020, Moncada's time with Bay Promo came to an unceremonious end. All in all, Bay Promo had paid Moncada approximately $41,000 for her services.[7]

---

[7] Moncada received roughly $41,000 from Bay Promo across three installments between March 28 and April 15, 2020. At trial, Arguello testified that this payment was, in part, a 25% advance on Moncada's New York Order commission because her father was in the hospital, and she needed to help pay for hospital bills. According to Arguello, he willingly made these payments to his employee and friend despite his understanding that Moncada's commission was only due once Denim & More paid the full balance of the New York Order. Bay Promo initially sued Moncada to recover these payments, but that claim got jettisoned. See back story infra note 8.

## II. PROCEDURAL HISTORY

With their desultory business engagement a wrap, Moncada and Bay Promo headed to the courts. In fall 2020, Bay Promo sued Moncada first alleging claims of breach of contract, unjust enrichment, violations of Florida's anti-surveillance statute, and misappropriation of trade secrets. Moncada answered by asserting four counterclaims against Bay Promo and a third-party complaint against Arguello, Jayasuriya, and Margina for breach of contract, violation of Fla. Stat. § 686.201, quantum meruit, and unjust enrichment (we'll explain later why Florida law governs the parties' dispute). For reasons unrelated to our work today, only Moncada's counterclaims against Bay Promo further advanced after some heated pre-trial skirmishes.[8]

Following a two-day bench trial, the district court found Bay Promo had breached the written Commission Agreement and that Moncada was entitled to an award of $218,400 as commission on the New York Order. However, the district court denied Moncada's remaining claims for commission on any other sales reasoning "there was no meeting of the minds to pay Moncada a further commission"

---

[8] Due to some questionable representations from Bay Promo, the affirmative claims against Moncada were dismissed with prejudice as a sanction, and that ruling has not been appealed. The district court also dismissed Moncada's third-party claims for lack of personal jurisdiction and her Fla. Stat. § 686.201 claim against Bay Promo because it determined the statute had been repealed well before she asserted her counterclaim.

and "no express contract" had formed. The district court also denied Moncada's alternative claims to equitable relief under a theory of implied contract because Moncada failed to prove that she conferred a benefit on Bay Promo for any sale following the New York Order.

With that procedural history in place, we can now turn to the parties' appellate contentions. At bottom, both parties think the district court got it wrong. Bay Promo thinks Moncada shouldn't have recovered any commission for the New York Order, and Moncada continues to argue she is entitled to a commission on every order placed by Parrish and Cravens during her tenure.

### III. DISCUSSION

Since both parties present multiple arguments on appeal, we will break them up and start with Bay Promo's claims of error.

### A. Bay Promo's Claims on Appeal

### 1. Bay Promo's Objections in Pink Highlighter

Bay Promo says the district court made a couple of evidentiary blunders. It believes the district court erred by failing to rule on evidentiary objections related to the admissibility of certain deposition testimony. Here's how that dispute came about.

Prior to trial, the district court issued an order which stated, in part, that "[t]he parties shall designate deposition testimony and/or discovery responses to be offered at trial." The

order went on to indicate that "[e]ach party shall then identify any objections [to the] offered testimony and shall mark the objected-to portions, by inclusive page and line, in **PINK** HIGHLIGHTER, indicating the basis for each objection in the margin next to each objected-to portion." (Emphasis in original). That same order also instructed the parties to file "Motions in Limine or other requests regarding foreseeable evidentiary issues, including authority for the ruling requested." Bay Promo contends it timely and properly submitted its pink-highlighted objections (though it clearly filed no motion seeking a preliminary ruling on its objections), and it faults the district court for never ruling on them. Had it done so, the court would have disallowed the contested evidence, and if not admitted, Moncada (to quote Bay Promo's brief) would have been unable to prove facts "relied on by Moncada to substantiate her defense" (even though Bay Promo was the one putting on a defense against Moncada's counterclaims at this point).

Given the terms of the district court's scheduling order, it should have been reasonably clear to Bay Promo that either the district court's failure to rule on the highlighted objections was an oversight (after all, district courts are very busy places), it found Bay Promo's objections meritless given Bay Promo's lack of follow through with the filing of an in limine motion on those objections, or it reflected the court's preference

of withholding a ruling until trial. But rather than seek clarification of the court's inaction or press for a definitive ruling, Bay Promo kept silent, first, when the court was entertaining in limine motions on other trial matters, and again, during trial, when Moncada moved for admission of the contested evidence. Because Bay Promo never sought to disentangle the district court's stance, its remonstrations here are likely not preserved and, at best, plain error review would adhere to our review. See Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 35 (1st Cir. 2011) (citing Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003)). But since the standard of review applicable to Bay Promo's claims is not outcome determinative, we will opt to afford those claims abuse of discretion scrutiny and resolve them with dispatch. Cf. Crowe, 334 F.3d at 134 & n.4.

The scheme for ruling on evidentiary objections has been codified in the 2000 Amendment to Rule 103 of the Federal Rules of Evidence and fairly imposes the burden to seek clarification of a ruling on the objecting party. Rule 103 provides in part: "Once the court rules definitively on the record -- either before or at trial -- a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). And "[a]s the commentary to the Rule makes clear: 'The amendment imposes an obligation on counsel to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on

- 17 -

that point.'" Crowe, 334 F.3d at 133 (quoting Fed. R. Evid. 103 advisory committee's note to 2000 amendment). Furthermore, and importantly here, "when the trial court appears to have reserved its ruling or to have indicated that the ruling is provisional, it makes sense to require the party to bring the issue to the court's attention subsequently." Fed. R. Evid. 103 advisory committee's note to 2000 amendment (emphasis added).

Indisputably, the district court was well within its discretion to defer ruling on the pink highlighted evidentiary challenges until the crucial moment when the admissibility of the contested evidence became a relevant trial issue. At that point the obligation most clearly fell to Bay Promo to protest whether the evidence could come in. See Crowe, 334 F.3d at 134 ("The burden . . . was on [the objecting party] to clarify whether the in limine ruling was final or not."); see also Dimanche v. Mass. Bay Transp. Auth., 893 F.3d 1, 6 n.6 (1st Cir. 2018). Instead, it sat mute. We further note that in claiming the district court should have ruled the contested evidence inadmissible, Bay Promo has not advanced any argument before us as to why that would be so. As such, we are left with nothing else to say other than we see no abuse of discretion in the district court putting off its evidentiary ruling, so we move on.

## 2. Exhibits Introduced in Spanish

Next up is Bay Promo's second evidentiary challenge. It asks this court to toss the district court's judgement in Moncada's favor because the court allowed her to enter into evidence several exhibits written in Spanish without certified English translations.[9]

Moncada spends little time responding to Bay Promo's claim as she states in her brief this is the first time this argument has surfaced. And since Bay Promo did not raise any objection below to evidence written in Spanish (and as we will discuss, Bay Promo actually consented to the use of evidence written in Spanish), Moncada argues Bay Promo has "failed to establish the requirements for appellate relief."

Here's how this language translation issue played out at trial. On day one, the district court brought to the parties' attention the potential appellate issues associated with untranslated trial evidence. In reply, Bay Promo told the court, "as long as your Honor is fluent enough in Spanish to read the originals, then I'm fine with it." From there, both Bay Promo and

---

[9] Citing <u>Gener-Villar</u> v. <u>Adcom Grp., Inc.</u>, 417 F.3d 201, 207 (1st Cir. 2005), Bay Promo also states that Moncada must now "provide such translations as part of the record on appeal." Given our merits resolution of this issue, we need say no more about this contention.

Moncada asked witnesses to translate exhibits from Spanish to English and discuss them in support of their respective arguments.

Given this joint acquiescence to the language process at trial, Bay Promo faces an insurmountable problem pressing its newfound challenge to the district court's decision to allow Spanish language exhibits. As we've said time and time again, a party "cannot concede an issue in the district court and later, on appeal, attempt to repudiate that concession and resurrect the issue. To hold otherwise would be to allow a litigant to lead a trial court down a primrose path and later, on appeal, profit from the invited error." Baker v. Smith & Wesson, Inc., 40 F.4th 43, 45 n.1 (1st Cir. 2022) (quoting United States v. Miranda-Carmona, 999 F.3d 762, 767 (1st Cir. 2021)). "We will not sanction such tactics," United States v. Gates, 709 F.3d 58, 63 (1st Cir. 2013) (citing Merchant v. Ruhle, 740 F.2d 86, 92 (1st Cir. 1984) (cautioning against the use of "agreeable acquiescence to perceivable error as a weapon of appellate advocacy")), so that ends that.

### 3. Challenges to Factual Findings

We next turn to Bay Promo's claim that the district court erred in several of its factual determinations relevant to Moncada's breach of contract claim. As Bay Promo broadly puts it, the district court "committed clear error when it misconstrued evidence." In doing so it contends that "insufficient evidence

exist[ed] to support each of [the district court's] key findings," all of which were cornerstones in Moncada's ability to prevail on her commission entitlement claims.[10]

We ordinarily review the district court's factual findings for clear error. See, e.g., Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 117 (1st Cir. 2016) (citing Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co., 880 F.2d 575, 576 (1st Cir. 1989)). So here goes. Bay Promo (quite confusingly) lists five findings which it says are wrong and mandate reversal of the judgement:[11] (1) The district court's determination that "Bay Promo, through Moncada, provided FDA Certifications to several of their customers." (2) The court's finding that Bay Promo failed to make a timely delivery of the New York Order.[12] (3) The district

---

[10] Bay Promo conflates the district court "misconstru[ing]" evidence with the issue of the court making factual findings based on "insufficient" evidence. For example, it is unclear whether Bay Promo argues the district court drew improper inferences from the evidence presented or whether the district court jumped to a certain conclusion without enough proof. As we discuss throughout the remainder of this section, Bay Promo's failure in the long run to explain and develop its arguments amounts to waiver of the issue.

[11] We note here that in trying to discern whether the district court erred in its factual determinations, "our ability to engage meaningfully with [Bay Promo's] claims is hampered by [its] failure to 'spell out [its] issues clearly, highlighting the relevant facts and analyzing on-point authority.'" See W.R. Cobb Co. v. V.J. Designs, LLC, 130 F.4th 224, 238 (1st Cir. 2025) (first two brackets added) (quoting Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011)).

[12] Interestingly, although Bay Promo says the district court erred in making this timeliness finding, it goes on to say that

- 21 -

court's erroneous conclusion that Bay Promo breached its contract with Denim & More because the PPE it delivered to New York had not originated from a factory for which Bay Promo had provided FDA certification. The operative contract, says Bay Promo, made no mention of Bay Promo having to utilize any specific manufacturers to use as a supplier and the court's determination that New York rightfully rejected the PPE goods as non-conforming was wrong. (4) The district court's unsupportable determination that Bay Promo had been fully paid by Denim & More for the Contour Order. (5) The district court's contradictory determinations that Moncada had been paid $41,000.00 for both her regular salary and commission on the New York Order, while simultaneously concluding that Bay Promo still owed Moncada a 6% commission on the total New York Order.

The difficulty we are having with Bay Promo's challenge is this. While it is apparent it believes some of the district court's "key findings" were "fundamentally incorrect," it does little to elaborate on why it believes that to be so. It does not point to any record evidence that it claims the district court purportedly misconstrued; it does not provide record citations that advance its propositions; it does not meaningfully confront the testimony and evidence relied upon by Moncada and the district

_____

such a finding is "irrelevant to the suit" because its contract with Denim & More allowed for delays in delivery.

court in making its factual determinations; and crucially, it does not tell us anything about what these purported errors mean in relation to its claims on appeal. See Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 38 n.8 (1st Cir. 2019) (deeming an argument that the district court committed clear error waived for lack of development); see also Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 54 (1st Cir. 1998) (outlining elements of an argument on clear error review of a factual finding). In other words, even if Bay Promo is correct that the district court's factual findings are incorrect, it does not explain why those enumerated errors are difference makers (i.e., prejudice) to its claims or defenses. Cf. González-Pagán v. Veterans Affs. Med. Ctr., No. 18-1323, 2020 WL 5550991, at *3 (1st Cir. June 23, 2020) (finding waiver of a claim against the district court's factual findings where appellant failed to explain the connection between those findings and the district court's holding); Rodríguez v. Mun. of San Juan, 659 F.3d 168, 176 (1st Cir. 2011) (finding waiver where a party did not explain how a legal "concept works generally or how it works here"). As such, Bay Promo has failed to develop a meaningful argument as to why the district court's factual determinations require reversal, and as such, it has waived the issues for lack of development. See Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000) ("[D]eveloping a sustained argument . . . is the job of the appellant, not the reviewing

court."); Nevor, 842 F.3d at 118 n.4 (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)) (deeming an argument presented as a "conclusory assertion" undeveloped and waived).

### 4. Ready, Willing, and Able Buyer

As earlier noted, the district court determined that Moncada was entitled to recover from Bay Promo the commission she earned on the New York Order. In its opening brief, Bay Promo protests this ruling, accusing the district court of misconstruing Florida law and thus erring as a matter of law in finding in Moncada's favor. Its reply brief adds a new gloss to the argument by accusing the district court of making clearly erroneous factual determinations. We skirt whether Bay Promo's terse one paragraph (half page) argument in its opening, and its new argument in its reply brief, is a dual flirtation with waiver,[13] and, given the argument's lack of merit, proceed to review the district court's factual findings for clear error and its legal interpretation of Florida law de novo.[14] See Touch v. Master Unit Die Prods., Inc.,

---

[13] See Town of Norwood, 202 F.3d at 405 (finding waiver of a claim for lack of development); Nevor, 842 F.3d at 118 n.4 (same); see also Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 25 (1st Cir. 2018) (citing Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990)) (finding waiver of a claim not raised in appellant's opening brief and only raised in a reply brief).

[14] The district court, applying Massachusetts law, gave effect to the choice of law provision of the contract between the parties. Furthermore, the parties agreed that Florida law ought to apply, and do not argue otherwise here on appeal. We find no reason to disrupt the district court's ruling that Florida law is the

43 F.3d 754, 757 (1st Cir. 1995) (first citing Salve Regina Coll. v. Russell, 499 U.S. 225, 233-35 (1991); and then citing Interstate Com. Comm'n v. Holmes Transp., Inc., 983 F.2d 1122, 1129 (1st Cir. 1993)).

We begin with the Commission Agreement's sole reference to Moncada's commission payments which serves as the toehold for the district court's award to her:

> [Bay Promo] will make commission payments to [Moncada] based on Commission based on 6% of gross sales of 3,640,000.00 USD. This commission will be paid at the conclution [sic] of each project. The commission rate will be determined by Humberto Arguello CEO by project by project basis.

In the court proceedings that flowed from this broken employment relationship, Bay Promo has never -- not then and not now -- accused Moncada of not upholding her end of the Commission Agreement, i.e., all agreed she brought Denim & More to the table for the sale.[15] Rather, Bay Promo maintained below that per the terms of the Commission Agreement, unless it received from Denim & More full payment for the New York Order, it was not liable to Moncada for a commission. In support of its claim, Bay Promo

_____

reasonable choice. See W.R. Cobb Co., 130 F.4th at 232 (citing Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000)).

[15] In opening arguments to the district court, Bay Promo informed the court it would "gladly pay the commission" if it received payment from Denim & More.

- 25 -

directed the district court to <u>Knowles</u> v. <u>Henderson</u>, 22 So. 2d 384 (Fla. 1945), asserting it stood for the proposition "that unless the failure of the deal is the sole responsibility, in this case of [Bay Promo]," (which it says it wasn't), "[Moncada] doesn't get paid." Interestingly, Moncada also pointed the district court to <u>Knowles</u> and contended a proper understanding of that case actually supports her claim for relief.

<u>Knowles</u> was a case involving a real estate sale. In it, the Supreme Court of Florida held a purchaser who agreed to buy a property for an agreed price, paid a percentage down payment, and stood ready to pay the remainder on delivery of the deed, remained a ready, willing, and able buyer, even though the seller thwarted the transaction (thus, entitling the broker to a commission). <u>Knowles</u>, 22 So. 2d at 385-86.[16] In explaining its reasoning, the

---

[16] As used in <u>Knowles</u>, the ready, willing, and able designation carries a distinct meaning under Florida law in the context of a brokerage agreement involving the sale of real estate. <u>See</u> 22 So. 2d at 385. Bay Promo does not argue that this specific meaning applies in the context of Moncada's duties under the Commission Agreement, and instead uses the term more generically to encompass Denim & More's obligations under the New York Order. Accordingly, our analysis is mindful of <u>Knowles</u>'s general contract principles and applies those principles (as Florida courts have done in other legal scenarios) while understanding the ready, willing, and able terminology in its most general sense -- a party prepared to consummate a deal. <u>See</u> <u>Aldora Alum. & Glass Prods., Inc.</u> v. <u>Poma Glass & Specialty Windows, Inc.</u>, No. 3:14-cv-1402-J-34JBT, 2015 WL 4092781, at *1-2, 5 (M.D. Fla. July 6, 2015) (citing <u>Knowles</u> generally in a contract dispute over the sale of business assets that did not involve a brokerage agreement for the sale of real estate); <u>see also</u> <u>Magnum Constr. Mgmt. Corp.</u> v. <u>City of Miami Beach</u>, 209 So. 3d 51, 55 (Fla. Dist. Ct. 2016) (citing <u>Knowles</u>

- 26 -

court there held "[i]t is a general principle of law, that he who himself prevents the happening or performance of a condition precedent, upon which his liability, by the terms of the contract, is made to depend, cannot avail himself of his own wrong and relieve himself from his responsibility to the obligee."  Id. at 386 (quoting Walker & McClelland v. Chancey, 117 So. 705, 707 (Fla. 1928)).

In rejecting Bay Promo's argument[17] that Knowles relieved it of any obligation to pay Moncada due to Denim & More's purported contract default on the New York Order (i.e., it didn't pay the balance owed), the district court determined that Bay Promo was the true contract breacher due to its failure to deliver FDA approved masks, and to do so in a timely fashion.  Conversely, it found Denim & More had satisfied its end of the bargain and, at the time of the breach, had remained a ready, willing, and able PPE purchaser as promised.  In attributing fault to Bay Promo for the New York Order's demise, the district court concluded that Denim & More was rightly relieved of its obligation to tender the

_____

generally in a contract dispute over the right to cure defects in a playground built by plaintiffs).

[17] We note that the district court first determined that it was not clear from the Commission Agreement as written whether Moncada was entitled to her payment before or only after Denim & More fulfilled its duties under the binding purchase agreement, but also that such a distinction was irrelevant to its ultimate analysis given its focus on which party breached the New York Order contract.

outstanding 50% of the purchase price, and that consistent with Knowles' general principles, the failure to consummate the sale did not vitiate Moncada's right to her commission balance. See id.

Before us, Bay Promo insists with scant elaboration, that the district court erred. After our careful scrutiny of its arguments, what they substantively appear to boil down to is not, as Bay Promo initially framed it, a legal argument premised on whether Denim & More was properly characterized as a ready, willing, and able buyer, but rather, a challenge to the district court's chief factual finding underpinning its contract breach determinations. Had the district court not found as a matter of fact that Bay Promo failed to timely deliver to New York masks from FDA certified Chinese factories, it could not have legally determined that Bay Promo breached the contract, which legally excused Denim & More from further payment of the balance. In other words, without such an erroneous factual determination about Bay Promo's performance relative to what the New York Order contract terms demanded, Denim & More would have been the party considered the breacher for withholding payment without just cause, and therefore, it would not have been properly viewed as a ready, willing, and able buyer, which, under Knowles, would have allowed Bay Promo to withhold Moncada's commission.

Notwithstanding Bay Promo's protestations, the record supports the district court's factual findings regarding Bay Promo's dereliction in timely delivering conforming and quality PPE product as required by the terms of the New York Order contract. As far as timeliness is concerned, Arguello testified that Bay Promo did not meet the first delivery date. Parrish also testified that the Order arrived "almost two months late" and the products that did arrive came from a factory that Bay Promo had not provided an FDA certification for. While finalizing the terms of the New York Order, Parrish requested and Moncada sent FDA certifications for five Chinese factories. The final invoice executing the New York Order expressly stated that the Bay Promo would deliver FDA approved masks. On March 29, 2020, Arguello sent Parrish an email with "FDA guarantee letter" in the subject line and assured the masks for the New York Order would be manufactured by Xiantao Sanda Industrial -- a company which Denim & More had received an FDA certification for courtesy of Moncada. But the masks did not come from Xiantao Sanda Industrial. On the second day of trial, Bay Promo produced a letter (for the first time) from Dong Yang Shi Qing Dou Home Articles Co., Ltd. (the previously unmentioned manufacturer of the masks that were eventually delivered to Denim & More, "Dong Yang" for short) dated November 3, 2020 asserting its FDA approval to manufacture masks. Bay Promo also produced at trial a certificate of registration

with the FDA for Dong Yang issued on April 15, 2020. The district court decided not to credit either piece of evidence's authenticity and did not credit Arguello's testimony that he sent this certification to Denim & More.

Our court has "repeatedly said that in a bench trial, credibility calls are for the trier." Morgan-Lee v. Therapy Res. Mgmt. LLC, 129 F.4th 93, 98 (1st Cir. 2025) (internal quotation marks omitted) (quoting Sawyer Bros., Inc. v. Island Transporter, LLC, 887 F.3d 23, 31 (1st Cir. 2018)). We find no reason to second guess the district court's determinations here given the timing and inconsistencies of Arguello's evidence alongside Moncada and Parrish's testimony, which was corroborated by their email correspondence and Arguello's email to Parrish guaranteeing a specific FDA approved manufacturer. And to the extent that the court's findings depended on its weighing of conflicting testimony, "such an appraisal falls peculiarly within the trial court's ken." Nevor, 842 F.3d at 119; see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (explaining that a finding based on the trial court's decision to credit one of two witnesses with a plausible story can "virtually never be clear error"). In sum, we find plentiful evidence in the record to support the district court's factual findings allocating fault for the collapse of the New York Order solely on the actions of Bay Promo. See Nevor, 842 F.3d at 119.

With this evidence established, Bay Promo has made no effort (even in the alternative) to explain why the court's legal determinations, based on the factual findings it actually made, were incorrect.[18]   Therefore, we affirm the district court's bottom-line conclusion that Bay Promo remains on the hook to pay Moncada a commission on the New York Order.

That's all for Bay Promo's claims on appeal.  We now may turn to Moncada's challenges to the district court's decision.

## B. Moncada's Claims on Appeal

Below, Moncada sought to recover damages for breach of contract after Bay Promo refused to pay her a commission on all the orders placed by Parrish and Cravens.  After convincing the district court that Bay Promo breached the initial Commission Agreement, Moncada was unsuccessful in persuading the court she was entitled to more.  She now offers two appellate asseverations for our review.  First, Moncada believes the district court erred in finding that she did not enter into any contract for a commission beyond her original Commission Agreement for the New York Order (without a contract for any of the other orders, no breach could have occurred).  Second, Moncada argues that even if

_____

[18] When the sales transaction in Knowles collapsed through no fault of the buyer (as the district court found was the case here) the Florida court found the broker still entitled to a sales commission as that buyer, as a matter of law, remained ready, willing, and able to proceed.  See Knowles, 22 So. 2d at 385-86.

- 31 -

she never entered into any subsequent written contracts, she is entitled to recover under an equitable theory of implied contract for the benefits she conferred upon Bay Promo. But as we're about to explain, we agree with the district court's conclusions and affirm.

Because Moncada appeals the results of a bench trial, we review the district court's finding of fact for clear error. See Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 420 (1st Cir. 1996). Additionally, "in a bench trial, credibility calls are for the trier," and cannot generally be second guessed on appeal. Morgan-Lee, 129 F.4th at 98 (quoting Sawyer Bros., 887 F.3d at 31). We "review the district court's legal determinations de novo, affording them no deference." W.R. Cobb Co., 130 F.4th at 232 (citing United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001)).

### 1. Breach of Contract Claims

We start with Moncada's assertion that the district court erred in finding no agreement took place to pay a 6% commission on any of the orders after the New York Order. According to Moncada, the preponderance of evidence submitted at trial shows that Arguello agreed, either verbally or through text messages, to pay her a commission on each sale involving Parrish or Cravens.

In support of its finding that Moncada did not meet her counterclaim burden, the district court's analysis began with the Commission Agreement, which the parties agree covered the New York Order and the general terms of Moncada's employment. The court observed that the Commission Agreement specifically indicated that for any subsequent projects beyond the New York Order, the "commission rate will be determined by Humberto Arguello CEO [on a] project by project basis." Since the Commission Agreement did not cover the nine orders that took place after the New York Order, the district court looked to see if there was any other evidence of new contract formation between the parties pertaining to those nine orders. In its assessment of the evidence, the district court found that Moncada had, in fact, tried on multiple occasions to consummate new commission contracts, but Bay Promo had never agreed to any of her offers. Therefore, said the district court, the parties never reached the requisite meeting of the minds needed to form an express contract for commission beyond the New York Order. Again, Moncada challenges that legal conclusion.

A reminder before we plunge into our analysis. For the reasons heretofore stated (i.e., we have no cause to disturb the parties' agreement to such), we will continue using Florida contract law to decide Moncada's challenges. Looking to that law we see that in order for Moncada to prevail, she must point to evidence demonstrating the basic requirements of contract

formation -- an "offer, acceptance, consideration[,] and sufficient specification of essential terms." See, e.g., St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004).

Unfortunately for Moncada, our search of the record reveals it is thin with respect to any agreements between Moncada and Bay Promo following the original Commission Agreement. To be sure, the record is replete with evidence that Moncada requested commissions from Bay Promo on several occasions, but Moncada concedes in her brief that despite her importuning, she only received a "single response by Arguello on the issue of Moncada's commissions" (and we hasten to add, an ambiguous one at that). Without a response from Bay Promo that would allow us to understand the essentials of a contract as contemplated by both parties, we cannot discern the requisite reciprocal assent needed to form a binding agreement. See Suarez Trucking FL Corp. v. Souders, 350 So. 3d 38, 42 (Fla. 2022).

To illustrate the point, the first project falling beyond the scope of the Commission Agreement was the Contour Order, and on March 24, 2020, Moncada asked Arguello about receiving a commission on it. Arguello directed her to Jayasuriya, and Moncada, through texts and emails, made it clear to both of Bay Promo's principals that she wanted to sign a second commission agreement. But Moncada's requests generated neither a written nor

- 34 -

an oral response from Arguello or Jayasuriya agreeing to pay Moncada a commission for the Contour Order.

The same goes for almost all the other orders (almost because Moncada did get that one response which we will discuss shortly). After missing out on the Contour Order, Moncada began pressing Arguello to mark up the price of products in the Cravens Orders so that Bay Promo could generate a 6% commission Moncada believed she was owed. The record shows that Moncada made these requests several times, but we discern no evidence deemed credible by the district court showing that Arguello agreed to these requests or charged the marked-up rates that Moncada wanted. And we have no basis to quibble with the court's finding.[19] As a

---

[19] Moncada contends otherwise, highlighting an April 7, 2020 WhatsApp conversation between Arguello and herself as evidence of a prior verbal agreement to mark up the prices of a Cravens Order. In the April 7 text exchange, Moncada requested a commission by marking up the prices on two orders placed by Cravens on March 26 and April 2, 2020. Curiously (as the district court pointed out) this would suggest Moncada and Arguello were still debating the price of items for orders that they had already received 50% deposits on ($185,250 on March 27, 2020 and $181,000 on April 2, 2020). We agree with the district court that Moncada's claim and the record's version of the story are quite different. Not only would marking up the price after receiving payment be an inconceivable business strategy, but contrary to Moncada's claim, the fact that the messages show a continuing disagreement in prices does not drive us toward the "irresistible conclusion" that a prior contract had already been formed. See F.W. Morse & Co., 76 F.3d at 420; see also Webster Lumber Co. v. Lincoln, 115 So. 498, 504 (Fla. 1927) (holding no meeting of the minds and consequently no contract can occur where the parties are negotiating the terms of an agreement).

reviewing court, we must be "especially deferential" to witness credibility evaluations of the district court. <u>United States</u> v. <u>Sierra-Ayala</u>, 39 F.4th 1, 13 (1st Cir. 2022) (quoting <u>United States</u> v. <u>Jones</u>, 187 F.3d 210, 214 (1st Cir. 1999)).

Turning to the only instance in which a message from Arguello might seemingly be viewed as a response to Moncada's request for a commission through marked up pricing, Moncada points to the Delta Order and argues that a series of texts created a binding contract entitling her to a 6% commission on that Order. It was the district court's view that Arguello's ambiguous, noncommittal response did not provide the essential terms required to create a binding contract, but obviously, Moncada disagrees.[20] As best we can tell, here's how that hyped exchange played out (which isn't totally clear because, like we said before, the correspondence took place in Spanish and neither party has provided certified translations).

On April 3, 2020, Arguello initiated a conversation with Moncada over WhatsApp asking her to send Parrish and his team a price estimate for what would become the Delta Order. The two went back and forth on whether to quote certain items at $1.50 or

---

[20] If you're wondering what Bay Promo thinks about Moncada's claims on appeal, it thinks the district court got it right and decided not to add anything further in its reply brief. So anytime we reference what the district court did, it is safe to say Bay Promo concurs.

$1.59 each, Moncada requesting the higher amount to cover her commission. Arguello explained that $1.50 was appropriate for this order because the purchaser was to cover the shipping costs. To this, Moncada replied with two separate statements, "from the $1.50 the 6% is included. I will do it right now." Arguello responded, "Yes. Send them the quote." To Moncada, this response from Arguello meant she would get 6% of the total Delta Order. However, to the district court, Arguello's "yes" response was a noncommittal, ambiguous answer falling short of providing the essential terms required to form a binding contract. We agree.

For over a hundred years, Florida contract law has required "reciprocal assent to a certain and definite proposition." Strong & Trowbridge Co. v. H. Baars & Co., 54 So. 92, 93 (Fla. 1910); see Suarez Trucking FL Corp., 350 So. 3d at 42. "There must therefore be an objective manifestation by both parties of assent to the same terms." Suarez Trucking FL Corp., 350 So. 3d at 42. However, from what we can discern about the WhatsApp text thread between Moncada and Arguello, "[t]here does not appear to have been a point reached in the correspondence where there was a definite proposal made by one of the parties which was unconditionally accepted by the other." See Webster Lumber Co. v. Lincoln, 115 So. 498, 504 (Fla. 1927). On the day of the relevant exchange between the parties, Moncada sent two distinct statements (it is not clear whether these statements came in two separate

- 37 -

texts or in one longer text with two components) but received only one response from Arguello. In the first statement, Moncada effectively requested a promise from Arguello that even the lower price point for the Delta Order would include her commission. In the second statement, Moncada said that she'd send the lower price quote "right now" -- the reason Arguello had reached out that day in the first place. To both statements, Arguello texted some thirty-two minutes later, "[y]es. Send them the quote." Based on this exchange, like the district court, we do not view Arguello's singular response following Moncada's two statements as an unambiguous assent to Moncada's request for a commission on the sale. In other words, Arguello's response does not reflect an objective manifestation "to make precisely the promise requested." Suarez Trucking FL Corp., 350 So. 3d at 43 (quoting 2 Lord, Williston on Contracts § 6:11 (4th ed. 2007)).

Summing up then, we affirm the district court's ruling that Bay Promo and Moncada did not establish any express contracts for a commission beyond the New York Order. And without an express contract, there could be no basis for recovery on such a theory.

## 2. Equitable Relief

Moncada's final claims to commission payments fare no better. Moncada argues her role in the facilitation of PPE sales following the New York Order entitles her to equitable relief under two separate (but similar) theories of implied contract: (1) a

contract implied in fact (a.k.a. quantum meruit) or (2) a contract implied in law (sometimes referred to as unjust enrichment or even a quasi-contract). See F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc., 311 So. 3d 39, 48 (Fla. Dist. Ct. App. 2021); Com. P'ship 8090 Ltd. P'ship v. Equity Contracting Co., Inc., 695 So. 2d 383, 387 (Fla. Dist. Ct. App. 1997). We note upfront that under any theory of equitable relief, a party cannot recover where an express contract exists. F.H. Paschen, 311 So. 3d at 49. When "the rights of the parties are described in a written contract," courts cannot rely upon the "legal fiction" of equitable remedies. Corn v. Greco, 694 So. 2d 833, 834 (Fla. Dist. Ct. App. 1997). Having already determined that no express contract was entered into between Moncada and Bay Promo for commission payments on sales beyond the New York Order, we may consider these equitable remedies.

Like before, we review the district court's interpretations of state law de novo and findings of fact for clear error. See Touch, 43 F.3d at 757 (1st Cir. 1995) (first citing Salve Regina Coll., 499 U.S. at 233-35; and then citing Interstate Com. Comm'n, 983 F.2d at 1129). And just to keep things straight, we'll stick with calling the equitable theories either contracts implied in fact or contracts implied in law, and we start with Moncada's implied in fact claim.

### i. Moncada's Contract Implied in Fact Claims

For Moncada to recover under a contract implied in fact, she must satisfy several elements as outlined by Florida law. A contract implied in fact arises where one party "provided, and the [other party] assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit would expect to pay for it." F.H. Paschen, 311 So. 3d at 48 (quoting W.R. Townsend Contracting, Inc. v. Jensen Civ. Constr., Inc., 728 So. 2d 297, 305 (Fla. Dist. Ct. App. 1999)). "Common examples of contracts implied in fact are where a person performs services at another's request, or 'where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances' fairly raising the presumption that the parties understood and intended that compensation was to be paid." Com. P'ship 8098, 695 So. 2d at 386 (quoting Lewis v. Meginniss, 12 So. 19, 21 (Fla. 1892)). In other words, a party arguing a contract implied in fact asks the court to find an implied promise was made. See id. at 387.

With these elements in mind, we look to what services Moncada says she provided for the non-New York Orders and ask whether Bay Promo should have expected to have paid Moncada a commission for them. Moncada argues that she conferred a benefit on Bay Promo with each order because she brought in Denim & More

through her personal connection with Parrish, and she therefore delivered all other orders through the "referral chain" that she started. Problem is, while Bay Promo may have received a net benefit from each subsequent sale, it was not a benefit Moncada herself provided through services she rendered, nor did Bay Promo implicitly ask her to provide such services. Cf. F.H. Paschen, 311 So. 3d at 50; see also Morgan & Morgan, P.A. v. Guardianship of McKean, 60 So. 3d 575, 577 (Fla. Dist. Ct. App. 2011) (explaining in a contract implied in fact claim that a court must consider the actual value of the services rendered); Solutec Corp. v. Young & Lawerence Assocs., Inc., 243 So. 2d 605, 606 (Fla. Dist. Ct. App. 1971) (explaining in a contract implied in fact claim that the measure of recovery is "the reasonable value of the labor performed . . . and not the value to the defendant that the completed project represents").

The difference between the benefit Moncada argues she provided to Bay Promo and the services she performed becomes clear when comparing the Contour Order to the original New York Order. Moncada brought Parrish to Bay Promo as a customer ready to buy PPE for New York City. A few days later, Parrish -- for whatever reason, maybe the price was right or customer service helpful -- returned with the prospect of the Contour Order. Moncada was copied on the initial email correspondence, but Arguello directly handled the invoices and otherwise worked on the

- 41 -

Contour Order. Bay Promo did not indicate that it wanted Moncada to solicit more business from Parrish or sell more PPE product to him. Once Parrish approached Arguello and Moncada with the possibility of the Contour Order, Moncada did not engage in negotiations to complete the sale. Cf. Fred McGilvray, Inc. v. Delphian Grp., Inc., 424 So. 2d 891, 892 (Fla. Dist. Ct. App. 1982) (finding sufficient evidence for a contract implied in fact where plaintiff produced a loan offer for defendant based on specific terms that defendant wanted); see also F.H. Paschen, 311 So. 3d at 50 (finding a contract implied in fact for costs incurred by one party after the other party requested and changed the scope of work of their original agreement). Unlike the New York Order where Moncada introduced a large order to Bay Promo, the evidence suggests that Moncada was merely along for the ride on the Contour Order with Parrish and Arguello handling the heavy lifting.

Turning to the Cravens Orders, Moncada similarly argues that she provided a benefit to Bay Promo by establishing the relationship with Denim & More that led to Cravens. Again, while Bay Promo may have benefitted from the relationship with Denim & More that led to Cravens placing several large orders for PPE, Moncada did not provide this benefit to Bay Promo through any services she performed. Cravens heard about Bay Promo from his former business associate Parrish and was not roped into the situation through any affirmative act or offer from Moncada. See

- 42 -

Morgan & Morgan, 60 So. 3d at 577; Solutec Corp., 243 So. 2d at 606. Furthermore, Moncada does not provide any citation to Florida caselaw to support her argument that a person in her employment position provides a benefit to their employer solely by creating a referral chain following a sale.[21] Therefore, Moncada did not provide a service entitling her to commission for the orders placed by Cravens either.

To repeat, a party arguing a contract implied in fact asks the court to find an implied promise was made. See Com. P'ship 8098, 695 So. 2d at 387. We do not find Bay Promo made such an implied promise to Moncada, nor did Moncada provide a service that Bay Promo should have expected to compensate her for based on her role in the orders following the New York Order. Therefore, we must reject her claim.

### ii. Moncada's Contract Implied in Law Claims

Unlike its factual counterpart, a contract implied in law is "an obligation created by the law without regard to the

---

[21] The few courts that have addressed claims for a commission deriving from a similar referral-chain-like pattern have declined to grant a commission without an express agreement to do so. Compare Scheduling Corp. of Am. v. Massello, 503 N.E.2d 806, 810-11 (Ill. App. Ct. 1987) (affirming award for commissions on sales resulting from clients referred by previously referred clients where the contract expressly allowed), with Lion's Prop. Dev. Grp. LLC v. New York City Reg'l Ctr., LLC, No. 651016/11, 2013 WL 1147365, at *2, 4-5 (N.Y. Sup. Ct. Mar. 15, 2013), aff'd, 984 N.Y.S.2d 4, 5 (N.Y. App. Div. 2014) (declining to award commissions on investors referred by a company whom plaintiff introduced to defendant where parties' contract did not support such an award).

parties' expression of assent by their words or conduct." F.H. Paschen, 311 So. 3d at 48 (quoting Com. P'ship 8098, 695 So. 2d at 386). In a contract implied in law claim, courts look to see whether: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." Id.

The first element of an implied in law contract is similar to an implied in fact contract requirement -- the person seeking recompense must have provided something of value to the person from whom payment is sought. See Com. P'ship 8098, 695 So. 2d at 386-87; see also 14th & Heinberg, LLC v. Terharr & Cronley Gen. Contractors, Inc., 43 So. 3d 877, 881-82 (Fla. Dist. Ct. App. 2010) (explaining that a plaintiff arguing under a theory of contract implied in law cannot recover the additional value of an unexpected windfall benefit gained by a defendant). And if the reader has been following along, they will already know we've determined that Moncada, beyond the New York order, has not met her burden of demonstrating she benefitted Bay Promo in the sense of personally ginning up and negotiating business. As the district court found, although Moncada may have contributed to these additional Parrish and Cravens orders by performing her general

job duties as described in the Commission Agreement, Moncada is not the person who brought those orders to Bay Promo. After being introduced by Moncada for the New York Order, Parrish emailed Bay Promo to initiate negotiations for the Contour Order and later referred Cravens to Bay Promo after Cravens contacted him with customers that needed PPE. The record does not show these sales were the fruits of any labor provided by Moncada, and accordingly, she has not provided a benefit to Bay Promo such that Bay Promo has a legal obligation to compensate her for it. See Com. P'ship 8098, 695 So. 2d at 386.

A parting thought on Moncada's equitable claims: "The law should place a tougher burden on a plaintiff who relies on an implied contract than it does on one 'who uses reasonable care and foresight in protecting [themselves] by means of an express contract.'" W.R. Townsend Contracting, Inc. v. Jensen Civ. Constr., Inc., 728 So. 2d 297, 305 (Fla. Dist. Ct. App. 1999) (quoting Hermanowski v. Naranja Lakes Condo. No. Five, Inc., 421 So. 2d 558, 560 (Fla. Dist. Ct. App. 1982)). Moncada may have avoided these issues through clearer drafting of her initial Commission Agreement, but as things turned out, we conclude she is not entitled to equitable relief.

## IV. CONCLUSION

Neither side has convinced us that the district court committed reversible error, and we affirm with each side to bear its own costs.

**Affirmed**.